# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

---

### NO. 03-24-00447-CR

---

**Francisco Barron-Munoz, Appellant**

**v.**

**The State of Texas, Appellee**

---

### FROM THE 27TH DISTRICT COURT OF BELL COUNTY
### NO. 80047, THE HONORABLE JOHN GAUNTT, JUDGE PRESIDING

---

## M E M O R A N D U M   O P I N I O N

Francisco Barron-Munoz was convicted of one count of aggravated sexual assault of a child, two counts of sexual assault of a child, and one count of sexual assault, and he was sentenced to 30 years' imprisonment for the aggravated offense, 20 years' imprisonment for both sexual-assault-of-a-child counts, and 25 years' imprisonment for the sexual-assault count. *See* Tex. Penal Code §§ 12.32, .33, 22.011, .021. The victim in each count was his stepdaughter I.D.,[1] and she was alleged to be younger than fourteen at the time of the aggravated offense and to be younger than seventeen at the time of the two sexual-assault-of-a-child offenses. In three issues on appeal, Barron-Munoz argues that the trial court erred by overruling his Rule 403

---

[1] Because I.D. and her sisters were minors for some or all the time that the alleged abuse occurred, we will refer to them by aliases and to their family members by the members' relationships to them. *See* Tex. R. App. P. 9.10(a)(3).

objection to I.D.'s sister's testimony and his objection to testimony concerning whether Mother believed I.D. and her sister. We will affirm the trial court's judgments of conviction.

## BACKGROUND

Barron-Munoz met Mother in 2008 and began dating her shortly thereafter. At the time, Mother had the following four daughters, listed in order of increasing age: A.D., I.D., J.D., and C.D. Barron-Munoz moved into Mother's home in 2009, and the couple married in 2010. When all four daughters lived in the home, A.D. and I.D. shared a bedroom, but when Mother asked J.D. and C.D. to leave the home, A.D. and I.D. were able to have their own rooms. Throughout the years, numerous family members and friends moved into the home for varying amounts of time. In 2016, Barron-Munoz and Mother had a daughter, P.M.

During the marriage, Barron-Munoz and Mother argued regularly, and Barron-Munoz was often asked to leave the house. Following one incident, the police arrested him for assault. Barron-Munoz had various jobs, and Mother mostly worked for the Bell County Sheriff's Office: first as a jailer and then as a deputy once she graduated from the police academy. While working for the Sheriff's Office, Mother often worked the night shift. She was fired in 2018 after the Sheriff's Office learned that she had pushed J.D. during a dispute.

On December 6, 2018, A.D. told Mother that Barron-Munoz had been in her bedroom that night masturbating over her while she was in bed. Mother confronted Barron-Munoz in the living room, and he denied the claim but agreed to leave the home as Mother demanded. I.D. was not home at the time, but Mother called her and told her to come home. I.D. drove home and saw Barron-Munoz packing his belongings. When Barron-Munoz left the

2

home, Mother asked I.D. if she thought A.D. might have been confused. A couple of days later, Barron-Munoz drove to I.D.'s work to tell her that he had done nothing wrong.

On December 9, 2018, I.D. told her best friend, who in the past had lived with I.D. and her family, that Barron-Munoz had been sexually abusing her; the friend told I.D. to tell the friend's father and stepmother. Once I.D. told them, the friend's stepmother told I.D. that she had to tell Mother; she followed I.D. to Mother's house to help support I.D.

When I.D. arrived home, she told Mother that she knew that A.D. was telling the truth because Barron-Munoz had been sexually abusing her as well. Mother called the police, and police officers came to the house, documented the claims that had been made, contacted the Department of Family and Protective Services (the "Department") to report the abuse, and arranged for A.D. and I.D. to have forensic interviews and forensic examinations. The Department created a safety plan that required Mother not to allow the children to have any contact with Barron-Munoz.

After I.D. told Mother about the abuse, Mother allowed Barron-Munoz to enter their home and go into I.D.'s bedroom with Mother, wake I.D. up, and confront her about the allegations. Regarding I.D.'s claims, Barron-Munoz asked I.D., "why now?" During the encounter, I.D. slapped Barron-Munoz, and he left the home. Following that exchange, Mother continued to meet with Barron-Munoz to get money from him. She also called one of her former coworkers with the Sheriff's Office to see if there were any active arrest warrants for Barron-Munoz stemming from the allegations that A.D. and I.D. had made. Subsequently, she called the lead investigator with the Sheriff's Office multiple times to tell him that the family wanted to drop the charges.

Although there was a safety plan in place, Mother drove to McAllen, Texas, with Barron-Munoz and P.M. At that time, the police were looking for Barron-Munoz's truck, and he wanted to transport the truck to his family in Mexico. Mother offered to drive the truck for him. Security cameras captured her crossing the border in the truck, and that information was relayed to the lead investigator in this case. While Mother drove to Mexico, she left P.M. in a hotel room with Barron-Munoz. After dropping the truck off in Mexico and returning to the hotel, Mother allowed Barron-Munoz to drive her oldest daughter's car.

After Mother returned home, the lead investigator went to Mother's home to ask her if she knew where Barron-Munoz was. When she said no, the investigator confronted her with an image of her driving Barron-Munoz's truck across the border. She then answered the investigator's questions and told the investigator where Barron-Munoz was living. On January 10, 2019, the investigator and other police officers went to that location and arrested Barron-Munoz. During the arrest, they found on his person a driver's license and a Social Security card with a different man's name on them. The Department removed the children from Mother's custody but returned them to her care a few months later. Shortly after the family finished the therapy ordered by the Department, Mother told I.D. to leave the home.

In the lead-up to trial, the prosecutors in this case talked with A.D., and in that conversation, A.D. revealed that there had been other instances of sexual abuse in addition to the one that she had told Mother about. The prosecutors arranged for A.D. to have another forensic interview where she detailed the additional abuse.

During the trial, multiple witnesses testified about the events set out above, and additional evidence was presented through the following witnesses called by the State: I.D., A.D., I.D.'s best friend, the friend's stepmother, Mother, the lead investigator, a forensic

4

interviewer, and a sexual assault nurse examiner ("SANE"). In his case-in-chief, Barron-Munoz elected to testify.

During her testimony, I.D.'s best friend explained that she slept at I.D.'s house multiple times and that one night she saw Barron-Munoz entering I.D.'s bedroom late at night. The friend also testified that Barron-Munoz would lie to Mother for I.D.'s benefit and buy I.D. a lot of clothes. The friend's stepmother testified as the outcry witness and explained that I.D. related to her that Barron-Munoz had been sexually abusing her for years, that the abuse started as his coming into her bedroom to masturbate "on top of her" and touch her breasts but escalated to sexual intercourse, and that I.D. had just learned that he had been abusing A.D. as well. I.D. told the outcry witness that she did not tell anyone sooner because Barron-Munoz was physically abusing Mother and because she was worried that telling Mother might result in her being abused if she confronted him. In addition to that reason, I.D. explained to the outcry witness that she had not disclosed the abuse sooner because she was afraid of him and was trying to protect her youngest sister P.M. from his anger.

While testifying, A.D. also stated that Barron-Munoz physically abused Mother. Regarding the physical abuse, A.D. remembered seeing him punch Mother in the face; she and her sisters had to hold him to stop him from hitting Mother again. In another incident, he strangled Mother while she was pregnant with P.M. A.D. also testified about sexual abuse he committed against her. Concerning one incident that occurred when she was eight and shared a room with I.D., A.D. explained that he entered the room, stood over I.D.'s bed where she was sleeping, grabbed his groin, and masturbated by moving his hands back and forth. He then moved over to A.D.'s bed, and she turned away, faced the wall, and pretended to be asleep. He started rubbing his penis on her butt. She testified that "[m]any" other incidents like that

5

occurred over four years, including his rubbing her butt while she was lying down. Additionally, she said that she would see Barron-Munoz go into I.D.'s bedroom and shut the door after I.D. got her own room.

A.D. remembered that the sexual abuse paused when Barron-Munoz stopped drinking after Mother became pregnant with P.M. but that it started again on December 6, 2018, when he started drinking again after she had turned twelve. Concerning the incident that night, she said that she woke up and saw Barron-Munoz masturbating over her. She testified that he stopped when he heard Mother coming out of her bedroom. Additionally, A.D. related that she did not want P.M. to have to go through this type of abuse and decided in that moment to tell Mother about the incident. Moreover, A.D. explained that she did not tell anyone about the abuse sooner because she was scared that Barron-Munoz might assault Mother if she confronted him. Further, A.D. related that Mother believed her initially but had doubts later.

A.D. admitted that she did not tell Mother about any abuse other than the December 6 incident and that she initially did not tell the police or the forensic interviewer about any other abuse; however, she explained that during her second forensic interview four years later she described everything that happened. She also agreed that she did not see Barron-Munoz's penis in detail because it was dark when the incidents occurred and because his penis was in his hand and that she never sought help from Mother even though she was close by. Further, she denied discussing the abuse with I.D.

I.D. testified that her biological father was deported when she was young, that Mother was mentally and physically abusive to her and her sisters, and that she felt left out of the family and kept to herself. Regarding Barron-Munoz, she testified that he became the father figure she wanted, spoiled her by buying whatever she asked for or by giving her money, and

6

protected her from Mother, and she said that the two of them did activities without the other family members being present. Further, she testified how various family members and friends had lived with the family over the years.

Concerning the sexual abuse, I.D. remembered that it started when she was twelve and occurred in her bedroom, in other rooms in the house, and in vehicles. Initially, Barron-Munoz would go into her bedroom, stand over her while she was in bed, unzip his pants, and masturbate in front of her face. That behavior happened many times. I.D. remembered that in one incident she was sleeping in Mother's bed with Mother when Barron-Munoz tried to masturbate over I.D., and I.D. agreed that she did not try to wake Mother up. The abuse escalated to his "coming into bed with [I.D.] and putting [her] on top of him," trying to kiss her, touching her breasts, and "making [her] grind on him" by moving her in a circular motion. When she turned thirteen, he began regularly inserting his fingers into her vagina and started making her touch his penis with her hands. Further, she stated that he made her "jerk him off" more than five times. After she turned fifteen, he began inserting his tongue into her vagina and did that more than one time. While she was sixteen, he offered to buy her "sexier underwear." In that same year, he removed her shorts during another incident and inserted his penis into her vagina. Although she tried to push him off and told him to stop, he "finished[ and] left the room." Moreover, she recalled that he inserted his penis into her vagina one more time after she turned seventeen and that she tried to stop him during that incident too but could not. Further, she recalled that the abuse stopped when Barron-Munoz gave up drinking.

I.D. believed that by having sex with Barron-Munoz without telling anyone, she was protecting her sisters from being subject to that type of abuse. Additionally, she stated that she did not tell Mother about the abuse because she was afraid Mother would not believe her and

because she did not feel like she had anywhere else to live if she had to leave the home. She explained that after A.D. made her outcry, Mother asked I.D. if she thought A.D. might be confused about what she saw on December 6. Next, I.D. related that she wanted to tell Mother about the abuse right then but could not do it yet and did not tell Mother until her friend's stepmother encouraged her to a few days later.

When I.D. told Mother about the sexual abuse, I.D. said that she knew A.D. was not making up the allegations because Barron-Munoz was abusing her too. Further, she related that she made the outcry when Mother expressed doubt about what A.D. had said because I.D. was afraid that Mother would let Barron-Munoz move back in and because I.D. wanted to prevent P.M. from being sexually abused. After hearing I.D.'s outcry, Mother called the police. However, later that month, Mother called I.D. a liar and told her to call the police and say that she lied about the allegations. Further, I.D. related that Mother told her to move out of the home shortly after the Department returned the children to Mother's care, and she believed it was because Mother was angry that she had made the outcry. Although she testified that she did not know if Mother told the police to drop the case, I.D. explained that she never asked the police to stop investigating.

The SANE testified that she performed an evaluation of I.D. During the examination, I.D. told the SANE that Barron-Munoz touched her body with his hands, mouth, and penis and that he touched her vagina, nipples, butt, and thighs. She related that the abuse started when she was eleven or twelve. In addition, she stated that he touched her vagina with his mouth, tried to kiss her, and made her touch his penis with her hands. Further, she informed the SANE that he inserted his penis into her vagina on two occasions when she was approximately seventeen. When describing the abuse, she said that Barron-Munoz ejaculated

8

during the incidents and that he would give her gifts and spoil her in exchange for the sexual activity. Moreover, she told the SANE that she did not report the abuse to protect Mother from him.

The forensic interviewer described what "grooming" was and explained it "is the emotional preparation for caregivers as well as the child" to lay the groundwork that might allow the offender to sexually abuse the child. In addition, she explained that an offender may target single mothers with multiple children who do not have a support system, might need financial support, and have tumultuous relationships with their children. She related that the stages of grooming are targeting and identifying the victim, gaining the trust of the child and caregiver, playing a role as a parental figure or friend, isolating the child from her siblings and caregiver by potentially providing favoritism toward the child, gauging the child's ability to keep a secret, introducing sexual topics, initiating sexual contact gradually, and controlling the relationship by either making the child afraid to say anything or making the child feel isolated and reliant on the offender. Additionally, she explained that favoring a child may make the child feel special but also serves to separate the child from her siblings. Next, the interviewer related that victims may not disclose abuse if they have unsupportive caregivers whom the victims feel would not believe them or have turbulent relationships with their caregivers. Additionally, she explained that some parents will protect the abusers and try to get the charges dropped. Regarding siblings, she testified that it is common for children in the same family to be victimized by the same offender.

Addressing the interviews performed in this case, the interviewer explained that she talked with A.D. and I.D. near the time of the outcries and then talked with A.D. again years later. Further, the interviewer related that I.D. disclosed behavior indicating that she had been groomed because Barron-Munoz treated her better than the other siblings and gave her gifts.

9

Turning to A.D., the examiner testified that Barron-Munoz just took the opportunity to abuse when it arose. When discussing the two interviews with A.D., she stated that in A.D.'s initial outcry A.D. described one incident but that in her subsequent interview occurring after a delayed outcry, she disclosed things she had not told anyone other than the prosecuting attorney. The examiner was unaware of any recantation in the case and explained that A.D.'s subsequent disclosure was not a recantation. The examiner admitted that she asks children in her interviews to tell her everything that happened but explained that children are sometimes not ready to disclose everything during an interview.

The lead investigator testified that Mother reported that Barron-Munoz had sexually abused her children. However, the investigator explained that later in the same month, she called the police twice to state that the family did not want to press charges against Barron-Munoz and that A.D. and I.D. might have been lying. The investigator was unaware of any communication by A.D. or I.D. indicating that either or both did not want the case to proceed. The investigator testified that Mother lied during the case, that she did not cooperate with him until he showed her a photo of her driving Barron-Munoz's truck across the border, and that she only then told the investigator where to find Barron-Munoz and admitted to helping Barron-Munoz obtain fake identification cards. The investigator also discussed how other police officers and he located and arrested Barron-Munoz and how Barron-Munoz initially claimed that he was not Barron-Munoz before admitting to being the person they were looking for and submitting to arrest without resisting.

In her testimony, Mother described her marriage with Barron-Munoz as one filled with a lot of physical and verbal abuse, explained that she would defend herself during the abuse, and agreed that he would get drunk occasionally. Regarding one incident of physical abuse, she

10

related that he bumped her, that she threw a coffee cup at him in response, that he started bleeding, that she drove him to the hospital, and that the police arrested him after determining that he was the initial aggressor. Mother agreed that the children once saw him abuse her and intervened. She estimated that he abused her more than ten but less than twenty times during their marriage. Further, she described him as controlling and testified that he isolated her from her friends and extended family.

Regarding the sexual abuse, Mother explained that she did see Barron-Munoz in I.D.'s room before December 2018 and said it seemed unusual but stated that there was no indication of anything inappropriate happening between him and I.D. or A.D. until December 2018. Further, she specified that he always defended I.D. Concerning the evening of December 6, she remembered A.D. coming into her room, crying, and saying that she was "afraid for [P.M.]." A.D. stated that Barron-Munoz had been in her room masturbating. Mother went downstairs and told Barron-Munoz to leave the home. She explained that she did not call the police at that time because she was in shock but did call the police a few days later when I.D. made her own disclosure about abuse by him. In response to the question, "As we sit here today, do you believe your girls," she responded, "I do."

Mother agreed that she arranged for Barron-Munoz to meet with I.D. and some of her siblings to discuss the abuse, that she later told the police that she wanted to drop the charges, that she contacted a friend at the Sheriff's Office to see if there was an active warrant for Barron-Munoz, that she met with him to get money, that she drove with him and P.M. to McAllen even though it violated the Department's safety plan, that she drove his truck to Mexico after he explained that he "wanted to get rid of it" because the police were looking for him in that truck, that she let him drive her oldest daughter's car, and that she lied to the police by saying she

11

did not know where he was. However, she explained that he denied the allegations during the meeting with her family, that she drove the truck to help him give the truck to his family, and that she did not try to help him hide from the police. Further, she admitted to being charged with a felony for her actions and pleading guilty in exchange for the State's agreeing to place her on deferred-adjudication community supervision.

In his case-in-chief, Barron-Munoz elected to testify and stated that all four of Mother's daughters lived in the house for some time before P.M. was born and that other people also lived in the home over the years. He claimed that Mother kicked him out of the house numerous times. Additionally, he admitted that he stopped drinking for a while before starting again. Regarding parenting responsibilities, he related that Mother and he divided the expenses for the children and that he was tasked with covering I.D.'s expenses for things like clothes and school supplies. However, he related that Mother was able to support the entire family on her salary and was not struggling financially. Concerning his truck, he explained that Mother told him to stop driving it because the police knew about the truck and instructed him to drive her daughter's car instead. Further, he claimed that his real driver's license and Social Security card were in Mother's daughter's car at the time of his arrest.

Regarding the allegations of sexual abuse, he denied having any sexual contact with A.D. or I.D. and said that the allegations were all false. Although he admitted that he went to the doorway of A.D.'s bedroom on December 6, he stated that he did so because she had been upset about losing her kitten earlier that day and because he wanted to check on her. He testified that she turned away from him and would not answer his questions. He did not know why the allegations were made against him, but he recalled that Mother told him that A.D. and I.D.'s biological father might have encouraged them to make up the claims against him or that the girls

12

lied because he did not buy them everything that they had wanted. Concerning his meeting with I.D. after she made her outcry, he said that the meeting was arranged so that he could confront I.D. about her claims and that he did so while she was in bed. During the meeting, he asked I.D., "why now?"

After considering the evidence presented at trial, the jury convicted Barron-Munoz of all four charged offenses. He appeals the trial court's judgments of conviction.

## DISCUSSION

In his first two issues on appeal, Barron-Munoz contends that the trial court erred by overruling his Rule 403 objection to A.D.'s testimony discussing sexual abuse he allegedly committed against her and discussing physical abuse he committed against Mother. In his third issue on appeal, he argues that the trial court erred by denying his objection to the portion of Mother's testimony discussing whether she believed I.D. and A.D.

**Rule 403**

*Background for First Two Issues*

After the jury was empaneled, the trial court held a hearing in which it determined that I.D. and A.D. could testify regarding extraneous offenses and that the stepmother of one of I.D.'s friends could testify as an outcry witness. During the hearing, the following witnesses testified in this order: I.D., the outcry witness, and A.D.

At the hearing, I.D. provided testimony similar to her testimony at trial discussing when the sexual abuse started, what types and how many acts of abuse occurred, and how the abused escalated over the years. Consistent with her testimony at trial, I.D. explained when and how A.D. and she made their outcries and how she did not tell anyone about the abuse for years.

13

I.D. also explained that she recently learned, after A.D. made her outcry, that A.D. had been abused and that I.D. thought she was protecting her siblings from the type of abuse she was experiencing by submitting to the sexual activity. As she did at trial, the outcry witness testified regarding her role in encouraging I.D. to tell Mother and regarding the types of abuse described by I.D., when they occurred, and how often. The outcry witness related that I.D. also mentioned that Barron-Munoz had fondled her younger sister while she was asleep and related that I.D. had not told anyone about the abuse before because Barron-Munoz "was very abusive to her mom and that she was afraid of him."

Finally, A.D. testified at the hearing, detailed the first incident of abuse as described in her testimony at trial, mentioned how long the abuse had been happening, and stated that the last incident occurred on December 6 shortly before she made her outcry. During her cross-examination, A.D. agreed repeatedly that she did not report the abuse for years. On redirect, she discussed how she saw Barron-Munoz physically abuse Mother by pushing her during an argument. She also testified that she saw him punch Mother in the face and that she and her sisters held him down to keep him from hitting Mother again. Regarding another incident, she explained that he strangled Mother while she was pregnant with her youngest sister. A.D. recalled being too scared to say or do anything, and she testified that viewing the physical abuse made her scared of him. Relatedly, she said the abuse made her worried that if she told Mother what happened and she overreacted, Barron-Munoz would hurt Mother.

*Standard of Review and Governing Law*

Appellate courts review a trial court's ruling regarding the admission or exclusion of evidence for an abuse of discretion. *See Tillman v. State,* 354 S.W.3d 425, 435 (Tex. Crim.

14

App. 2011). Under that standard, a trial court's ruling will be deemed an abuse of discretion only if it is so clearly wrong as to lie outside "the zone of reasonable disagreement," *Lopez v. State*, 86 S.W.3d 228, 230 (Tex. Crim. App. 2002), or is "arbitrary or unreasonable," *State v. Mechler*, 153 S.W.3d 435, 439 (Tex. Crim. App. 2005). Moreover, the ruling will be upheld provided that the trial court's decision "is reasonably supported by the record and is correct under any theory of law applicable to the case." *Carrasco v. State*, 154 S.W.3d 127, 129 (Tex. Crim. App. 2005). In addition, an appellate court reviews the trial court's ruling considering the record before the court "at the time the ruling was made." *Khoshayand v. State*, 179 S.W.3d 779, 784 (Tex. App.—Dallas 2005, no pet.).

Rule of Evidence 403 specifies that relevant evidence may be excluded "if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, or needlessly presenting cumulative evidence." Tex. R. Evid. 403. "Under Rule 403, it is presumed that the probative value of relevant evidence exceeds any danger of unfair prejudice. The rule envisions exclusion of evidence only when there is a clear disparity between the degree of prejudice of the offered evidence and its probative value." *Hammer v. State*, 296 S.W.3d 555, 568 (Tex. Crim. App. 2009) (footnotes and internal quotation marks omitted). Accordingly, "the plain language of Rule 403 does not allow a trial court to exclude otherwise relevant evidence when that evidence is merely prejudicial. Indeed, all evidence against a defendant is, by its very nature, designed to be prejudicial." *Pawlak v. State*, 420 S.W.3d 807, 811 (Tex. Crim. App. 2013) (internal citation omitted).

Although what follows is not an exhaustive list, courts generally balance the following factors when performing a Rule 403 analysis: "(1) how probative the evidence is;

15

(2) the potential of the evidence to impress the jury in some irrational, but nevertheless indelible way; (3) the time the proponent needs to develop the evidence; and (4) the proponent's need for the evidence." *Colone v. State*, 573 S.W.3d 249, 266 (Tex. Crim. App. 2019); *see Gigliobianco v. State*, 210 S.W.3d 637, 641-42 (Tex. Crim. App. 2006). In this context, "probative value" refers to how strongly evidence makes the existence of a "fact of consequence" "more or less probable" and to how much the proponent needs the evidence, and "[u]nfair prejudice" refers to how likely it is that the evidence might result in a decision made on an "improper basis," including "an emotional one." *Davis v. State*, 329 S.W.3d 798, 806 (Tex. Crim. App. 2010) (quoting *Casey v. State*, 215 S.W.3d 870, 879 (Tex. Crim. App. 2007)).

*Analysis Regarding Testimony Concerning Sexual Abuse*

Probative Value

In his first issue, Barron-Munoz asserts that the trial court should have sustained his Rule 403 objection and prohibited A.D. from testifying about her sexual abuse. Concerning the probative value of that testimony, he acknowledges that her testimony could help to show that what he "was accused of doing to I.D. was not necessarily out of character," but he contends "that the probative nature of the character evidence [wa]s speculative at best." Stated differently, he argues that the testimony only "*suggests* that he acted in conformity with his character." Additionally, he speculates that the testimony regarding crimes committed against A.D. did not have much probative value concerning the allegations regarding I.D., which he describes as being "of a different magnitude than those committed against A.D." Accordingly, he argues that this factor weighed against admission of the evidence.

16

Under the Code of Criminal Procedure, evidence that a defendant charged with a sexual offense involving a minor committed a separate sexual offense involving a minor may be admitted "for any bearing the evidence has on relevant matters, including the character of the defendant and acts performed in conformity with the character of the defendant." Tex. Code Crim. Proc. art. 38.37, § 2. Moreover, nothing in the language of article 38.37 suggests that the extraneous offenses must be similar to the charged offenses in order to be admissible; on the contrary, the provision lists the statutes setting out the potential charged sexual offenses to which article 38.37 applies and then explains that evidence showing that the defendant committed an extraneous sexual offense as defined by any statute in the list may be admitted into evidence. *See id.* In other words, by statute, this type of evidence was relevant to a determination of Barron-Munoz's guilt. *See id.*

Additionally, even though A.D.'s testimony seemed to describe indecency with a child and not sexual assault, in cases where the primary offenses involve sexual assaults of children and where the extraneous offenses involve allegations of indecency with a child, *see* Tex. Penal Code §§ 21.11, 22.011, .021, appellate courts have determined that extraneous indecency-with-a-child offenses were admissible under article 38.37. *See, e.g.*, *Delk v. State*, No. 14-22-00140-CR, 2023 WL 5367530, at *1, *6 & n.3, *8, *9 (Tex. App.—Houston [14th Dist.] Aug. 22, 2023, no pet.) (mem. op., not designated for publication); *Watson v. State*, No. 08-19-00026-CR, 2020 WL 4581888, at *1-4 (Tex. App.—El Paso Aug. 10, 2020, pet. ref'd) (op., not designated for publication); *Delacruz v. State*, No. 05-14-01013-CR, 2016 WL 1733461, at *1, *3, *8 (Tex. App.—Dallas Apr. 28, 2016, pet. ref'd) (mem. op., not designated for publication).

17

Further, prior to the trial court's ruling, the outcry witness and I.D. both testified at the hearing and explained that although the abuse eventually escalated to Barron-Munoz's having sexual intercourse with I.D., the abuse began as his masturbating over her when she was between ten and twelve years old, which was similar to what A.D. described about his behavior and her age when the incidents occurred. *See James v. State*, 623 S.W.3d 533, 547 (Tex. App.—Fort Worth 2021, no pet.) (explaining that probative value increases if extraneous offense is similar to charged one). Additionally, I.D. testified at the hearing that she made an outcry after learning that A.D. had also been abused, and evidence concerning A.D.'s abuse was probative of why I.D. made her outcry when she did.

Moreover, I.D. testified during the hearing that Barron-Munoz sexually abused her for years while she was a minor, and the evidence from A.D. discussing sexual abuse by him over a several-year period when she was a minor was probative of whether Barron-Munoz sexually abused I.D. as alleged in the indictment. *See Castaneda v. State*, 694 S.W.3d 13, 24 (Tex. App.—Houston [14th Dist.] 2023, pet. ref'd); *see also Brickley v. State*, 623 S.W.3d 68, 81 (Tex. App.—Austin 2021, pet. ref'd) (noting that evidence of "continuing course of conduct" can increase probative value of extraneous offense).

Although A.D. explained that the abuse occurred over a several-year period, she also explained that one incident occurred in December 2018, which was within a few months of Barron-Munoz's indictment. *See Gaytan v. State*, 331 S.W.3d 218, 226 (Tex. App.—Austin 2011, pet. ref'd) ("[R]emoteness can lessen significantly the probative value of extraneous-offense evidence."); *see also Robinson v. State*, 701 S.W.2d 895, 898 (Tex. Crim. App. 1985) (concluding that offense occurring four-to-six months earlier had probative value).

18

Finally, during voir dire, Barron-Munoz indicated that this case would turn on the credibility of A.D. and that children can lie. A.D.'s testimony was probative to rebut the defensive theory that I.D. "fabricated her allegations." *See Castaneda*, 694 S.W.3d at 24; *see also Bargas v. State*, 252 S.W.3d 876, 890 (Tex. App.—Houston [14th Dist.] 2008, pet. ref'd) (noting that extraneous-offense evidence can be admitted to rebut defensive theory).

For these reasons, the trial court could have determined that the probative value of the extraneous-offense evidence weighed in favor of admission.

Potential Prejudice

In his brief, Barron-Munoz notes that evidence of sexual offenses involving children is inherently inflammatory and prejudicial; he argues that the admission of the testimony allowed the jury to decide on an improper basis. He also argues that A.D. testified with "the burden of hindsight of an eight-year-old viewing and describing events from ten years earlier." For these reasons, he asserts that this factor weighed against admission.

We first note that A.D.'s testimony addressed self-contained acts and did not address a complex subject matter that could have misled the jury. *See Gigliobianco*, 210 S.W.3d at 641. Additionally, the testimony by A.D. addressed actions that were less "serious than the allegations forming the basis for the indictment" in this case. *See Robisheaux v. State*, 483 S.W.3d 205, 220 (Tex. App.—Austin 2016, pet. ref'd). Moreover, the trial court included in the jury charge an instruction directing the jury that it may consider evidence regarding extraneous sexual offenses only if they first found beyond a reasonable doubt that Barron-Munoz committed the offenses. Consistent with article 38.37, the charge then instructed that if the jury made that finding, they could consider the evidence for any relevant matters, including

19

his character and acts performed in conformity with that character. *See* Tex. Code Crim. Proc. art. 38.37, § 2; *see also Beam v. State*, 447 S.W.3d 401, 405 (Tex. App.—Houston [14th Dist.] 2014, no pet.) (noting that "the impermissible inference can be minimized through a limiting instruction"); *Gaytan*, 331 S.W.3d at 228 (stating that appellate courts "presume that the jury obeyed" limiting instructions).

In light of these considerations, the trial court could have reasonably determined that the evidence would not impress the jury in an irrational manner and that this factor weighed in favor of admission.

Time Required

Regarding the third factor, Barron-Munoz asserts that "[t]he extraneous testimony took approximately the same amount of time to present as that in the charged offense itself." For that reason, he suggests that this factor weighed against admission of the evidence.

At the hearing, the portion of A.D.'s testimony concerning the extraneous sexual offenses constituted approximately eighteen pages of the record. Further, we note that the guilt-innocence phase of the trial was conducted over three days. The portions of the reporter's record of the days during which testimony was provided totals over 500 pages. Of those pages, A.D.'s trial testimony totaled approximately 66 pages, of which about 50 pages were about the sexual abuse Barron-Munoz committed against her. *See Lane v. State*, 933 S.W.2d 504, 520 (Tex. Crim. App. 1996) (concluding this factor weighed in favor of admission where extraneous-offense evidence was less than one-fifth of trial testimony).

Accordingly, the trial court could have reasonably concluded that the factor considering the time needed to develop the evidence weighed in favor of admission.

Need for the Evidence

Concerning the final factor, Barron-Munoz argues that the State did not need the evidence because I.D. was an adult at the time of trial, remembered the alleged offenses, and could articulate her claims. For those reasons, he contends that the jury could fairly weigh her testimony against his denials and, therefore, that the final factor weighed against admission.

However, as discussed above, A.D.'s testimony was admissible "for any bearing the evidence has on relevant matters, including the character of the defendant and acts performed in conformity with the character of the defendant." Tex. Code Crim. Proc. art. 38.37, § 2. Additionally, her testimony was probative to rebut the defensive theory that I.D. lied about the abuse. *See Castaneda*, 694 S.W.3d at 24. Further, during voir dire, Barron-Munoz explained that there would be no DNA or fingerprint evidence and that the case would turn on credibility determinations regarding the witnesses. *See Lozano v. State*, 706 S.W.3d 429, 446 (Tex. App.—Austin 2024, no pet.) (listing lack of forensic evidence that crime occurred as indicator that State needed evidence of extraneous offenses); *see also James*, 623 S.W.3d at 548 (noting that State had strong need for extraneous-offense evidence because no one witnessed charged offenses and because victim's credibility was at issue). Before A.D. testified at the hearing, I.D. testified in the hearing that Barron-Munoz abused A.D. as well, but I.D. did not provide any details regarding the abuse against A.D. *Cf. Brickley*, 623 S.W.3d at 82 (noting when deciding that State needed evidence of extraneous offenses that "although several witnesses testified before the evidence at issue was admitted, those witnesses did not describe incidents of prior abuse").

Considering the preceding, the trial court could have reasonably concluded that the State's need for the evidence concerning extraneous offenses against A.D. weighed in favor of admission.

21

Given our standard of review, the presumption in favor of admissibility, and the resolution of the factors above, we cannot conclude that the trial court abused its discretion by overruling Barron-Munoz's Rule 403 objection. *See id.* at 83; *see also Hammer*, 296 S.W.3d at 561-62 (explaining that sexual assault cases often are he-said, she-said cases and that Rule 403 "should be used sparingly to exclude relevant, otherwise admissible evidence that might bear upon the credibility of either the defendant or complainant in such 'he said, she said' cases").

For these reasons, we overrule Barron-Munoz's first issue on appeal.

*Analysis Regarding Testimony Concerning Physical Abuse*

Probative Value

In his second issue, Barron-Munoz contends that the trial court should have excluded A.D.'s testimony regarding physical abuse against Mother. Concerning the probative value of that evidence, Barron-Munoz argues that the testimony had a low probative value because it was "not particularly relevant to" the sexual-abuse allegations and because the presence of one type of abuse "in a familial relationship is not necessarily indicative of the presence of the other" type of abuse. For those reasons, he argues that this factor weighed against admission.

During the hearing, A.D. described the sexual abuse committed by Barron-Munoz against her in her direct testimony. When Barron-Munoz cross-examined her, she admitted that she did not tell anyone about the abuse until December 2018 even though the abuse had been going on for years. On redirect, A.D. explained that she had observed Barron-Munoz physically abuse Mother by pushing her, punching her in the face, and strangling her. Further, she stated that witnessing those incidents made her afraid of Barron-Munoz, made her too scared to say or

22

do anything, and caused her to worry that he would hurt Mother if she told Mother about the abuse and Mother confronted him. Accordingly, the testimony concerning the physical abuse A.D. observed Barron-Munoz commit against Mother had probative value because it helped explain why A.D. delayed reporting the abuse. *See Brickley*, 623 S.W.3d at 81; *see also Elkins v. State*, No. 03-23-00443-CR, 2024 WL 3462043, at \*9 (Tex. App.—Austin July 19, 2024, no pet.) (mem. op., not designated for publication) (explaining that evidence of physical abuse can explain victim's "hesitancy in reporting the offense or pressing charges").

Moreover, although A.D. did not provide dates for when the abuse occurred, she described separate incidents of abuse. *See Brickley*, 623 S.W.3d at 81 (explaining that continuing course of conduct increases probative value of extraneous offense). Further, A.D. testified during the hearing that Barron-Munoz strangled Mother while she was pregnant with her youngest sister, and I.D. previously testified during the hearing that her youngest sister was two years old. *See Prince v. State*, 192 S.W.3d 49, 55 (Tex. App.—Houston [14th Dist.] 2006, pet. ref'd) (deciding that ten-year gap did not make extraneous offenses too remote); *Corley v. State*, 987 S.W.2d 615, 617, 621 (Tex. App.—Austin 1999, no pet.) (concluding that crime that occurred thirteen years before trial was not too remote).

For these reasons, the trial court could have reasonably concluded that the probative value of the physical-abuse testimony weighed in favor of admission.

Potential Prejudice

Barron-Munoz contends that the second factor weighed in favor of exclusion because "evidence of physical spousal abuse is particularly prejudicial" in general and is "even

23

more so" in this case where the abuse involved a claim of strangulation. Accordingly, he asserts that the testimony "would suggest a decision by the jury based on an improper basis."

As an initial matter, we note that the testimony concerning physical abuse did not address a complex subject matter and addressed self-contained acts. *See Gigliobianco*, 210 S.W.3d at 641 (explaining that scientific evidence is type of evidence that might mislead jury not properly equipped to consider probative value). Although evidence concerning spousal abuse, particularly abuse involving strangulation of a pregnant woman, is undoubtedly prejudicial, it is no more heinous than the charged offenses of aggravated sexual assault of a child and sexual assault of a child. *See Robisheaux*, 483 S.W.3d at 220; *see also Dies v. State*, 649 S.W.3d 273, 286 (Tex. App.—Dallas 2022, pet. ref'd) (explaining that offenses involving "child sexual abuse" are "inherently inflammatory"). Moreover, although no limiting instruction was included in the jury charge concerning the extraneous offenses involving physical abuse, no limiting instruction was requested. *See Delgado v. State*, 235 S.W.3d 244, 251 (Tex. Crim. App. 2007) (noting that "if a defendant does not request a limiting instruction . . . at the time that evidence is admitted, then the trial judge has no obligation to limit the use of that evidence later in the jury charge").

Accordingly, the trial court could have reasonably concluded that this factor weighed neither in favor of nor against admission.

Time Required

Regarding the time needed to develop the evidence, Barron-Munoz concedes that "the testimony about spousal abuse was straightforward and did not take up much time to elicit."

24

As set out above, the entirety of A.D.'s testimony at the hearing was eighteen pages. The portion of her testimony concerning the acts of physical abuse was only two pages. Similarly, at trial, A.D. mentioned the physical abuse or her fear for Mother's safety on approximately five pages of the over 500-page record for the guilt-innocence phase held over three days. *See Brickley*, 623 S.W.3d at 82 (determining that this factor weighed in favor of admission where testimony was five pages out of record spanning hundreds of pages); *see also Robisheaux*, 483 S.W.3d at 221 (finding this factor weighed in favor of admission where evidence regarding extraneous offense came in though one witness, where guilt-innocence phase lasted three days, and where testimony about extraneous offense "was only eight pages long").

Need for the Evidence

Turning to the final factor, Barron-Munoz contends that A.D.'s testimony "was cumulative of other evidence" concerning spousal abuse "presented by [Mother] herself" and, accordingly, that the State's need for the evidence was low.

As an initial matter, we note that the trial court made its Rule 403 ruling in the hearing before any witnesses, including Mother, testified at trial, and appellate courts review the ruling in light of the record before the trial court when it made the ruling. *See Khoshayand*, 179 S.W.3d at 784. Moreover, as set out above, A.D.'s testimony concerning the physical abuse helped establish why A.D. did not report the abuse sooner. *See Brickley*, 623 S.W.3d at 81. The outcry witness testified at the hearing that I.D. told her that Barron-Munoz abused Mother and that she was afraid of him, but the outcry witness did not provide any testimony concerning why A.D. did not report the abuse sooner. Similarly, I.D. did not provide any testimony at the

25

hearing about why A.D. did not report the abuse sooner or whether she was afraid to report the abuse because Barron-Munoz might hurt Mother.

Accordingly, at the time the trial court made its ruling, no witness other than A.D. testified regarding the reasons A.D. delayed making an outcry. *See Erazo v. State*, 144 S.W.3d 487, 495-96 (Tex. Crim. App. 2004) (noting that when deciding whether evidence was needed, reviewing courts should consider whether proponent had other evidence to establish fact of consequence). Moreover, there were no witnesses to the sexual offenses other than A.D. and I.D., and their credibility was a disputed issue in the case. *See id.* (emphasizing that reviewing courts should consider whether "fact of consequence related to an issue that is in dispute"); *see also James*, 623 S.W.3d at 548 (noting that State had strong need for extraneous-offense evidence because no one witnessed charged offenses and because victim's credibility was at issue).

In light of the preceding, the trial court could have reasonably determined that the State's need for the evidence weighed in favor of admission.

Based on our standard of review, the presumption in favor of admissibility, and the resolution of the factors above, we cannot conclude that the trial court abused its discretion by overruling Barron-Munoz's Rule 403 objection to A.D.'s testimony concerning his physical abuse. *See Brickley*, 623 S.W.3d at 83.

For these reasons, we overrule Barron-Munoz's second issue on appeal.

**Mother's Testimony About Believability**

In his third issue on appeal, Barron-Munoz contends that the trial court erred when it denied his objection to Mother's testimony about whether she believed her daughters.

26

As set out above, Mother was asked whether she believed her daughters, and she responded, "I do." He argues that this type of testimony does not assist the jury to understand the evidence but rather decides the issue for the jury. Accordingly, he argues that Mother was able to provide impermissible opinion testimony about the truthfulness of her daughters despite his objection.

As with the previous issues, we review the trial court's ruling for an abuse of discretion. *See Tillman*, 354 S.W.3d at 435. Generally, neither expert witnesses nor lay witnesses may testify to the truthfulness of a witness's testimony. *See Schutz v. State*, 957 S.W.2d 52, 59 (Tex. Crim. App. 1997); *Pavlacka v. State*, 892 S.W.2d 897, 902 n.6 (Tex. Crim. App. 1994); *Yount v. State*, 872 S.W.2d 706, 711 (Tex. Crim. App. 1993); *Fuller v. State*, 224 S.W.3d 823, 833 (Tex. App.—Texarkana 2007, no pet.). By questioning Mother about her opinion that her children were not fabricating their allegations, the State arguably elicited from Mother an impermissible opinion as to their truthfulness. *See Sandoval v. State*, 409 S.W.3d 259, 292 (Tex. App.—Austin 2013, no pet.). However, Barron-Munoz made Mother's opinion about the truthfulness of her daughters' claims an issue by asserting in his opening argument that Mother's actions demonstrated that she did not believe her daughters' allegations. *See Jones v. State*, 241 S.W.3d 666, 669-70 (Tex. App.—Texarkana 2007, no pet.) (noting that opening argument can open door to admission of evidence). In light of the preceding, we do not believe that the trial court abused its discretion by overruling the objection. *See Fitzgerald v. State*, No. 11-10-00048-CR, 2012 WL 683400, at *3 (Tex. App.—Eastland Feb. 29, 2012, pet. ref'd) (mem. op., not designated for publication) (concluding that trial court did not abuse its discretion by overruling objection to testimony from mother that she believed her daughter where defense had attacked victim's character for truthfulness).

Even if the trial court abused its discretion by overruling the objection, we would still be unable to sustain the issue. The erroneous admission of testimony is non-constitutional error. *See Jessop v. State*, 368 S.W.3d 653, 678 (Tex. App.—Austin 2012, no pet.). Because the error is non-constitutional, it must be disregarded unless it affected Barron-Munoz's substantial rights. *See* Tex. R. App. P. 44.2(b). A substantial right is affected when the error had a substantial and injurious effect or influence in determining the jury's verdict. *See Coble v. State*, 330 S.W.3d 253, 280 (Tex. Crim. App. 2010).

In determining whether a defendant's substantial rights were affected, the reviewing "court should consider everything in the record, including any testimony or physical evidence admitted for the jury's consideration, the nature of the evidence supporting the verdict, the character of the alleged error and how it might be considered in connection with other evidence in the case." *Morales v. State*, 32 S.W.3d 862, 867 (Tex. Crim. App. 2000); *see Motilla v. State*, 78 S.W.3d 352, 355 (Tex. Crim. App. 2002). "The reviewing court may also consider the jury instructions, the State's theory and any defensive theories, closing arguments and even voir dire, if applicable," and the court may also consider "whether the State emphasized the error." *Motilla*, 78 S.W.3d at 355-56. If the reviewing court, "after examining the record as a whole, has fair assurance that the error did not influence the jury, or had but a slight effect," then the defendant's substantial rights were not affected. *Id.* at 355 (quoting *Solomon v. State*, 49 S.W.3d 356, 365 (Tex. Crim. App. 2001); *Johnson v. State*, 967 S.W.2d 410, 417 (Tex. Crim. App. 1998)).

In his brief, Barron-Munoz contends that Mother's testimony harmed him because it distracted the jury from its main task—"to decide whether [he] was guilty of specifically described offenses." As support for this argument, he asserts that the evidence of his "guilt was

28

not overwhelming" because "there was no physical or forensic evidence of sexual assault (such as DNA) adduced at trial" and because no witnesses other than I.D. or A.D. testified that they observed any abuse. Building on the preceding, Barron-Munoz contends that Mother's testimony bolstered the jury's assumption that the State did not find him credible because it decided to prosecute him. Further, he acknowledges that the evidence showing that Mother helped him indicated that she did not believe her children, but he suggests that her subsequent impermissible testimony completely "countered that implication." Although he notes that there was evidence Mother wanted the charges dropped, he insists that was due to her concern about his continued financial contributions and could not counter the effect of her believability testimony. Similarly, he acknowledges that Mother subsequently testified in her cross-examination that she did not know what to believe about the allegations and that the investigator testified that Mother told him that A.D. and I.D. were lying, but he suggests that this evidence was elicited in response to Mother's prior damaging testimony. Next, he argues that he would not have been allowed to elicit evidence from witnesses concerning I.D.'s and A.D.'s credibility and that his testimony denying the accusations was insufficient to refute the improper effect of Mother's testimony.

As an initial matter, we note that unlike a circumstance in which a jury might be moved by an expert's testimony that a victim was truthful, a jury generally would expect that a parent believes her child is being truthful and would view testimony to that effect with skepticism. *See Fisher v. State*, 121 S.W.3d 38, 41-42 (Tex. App.—San Antonio 2003, pet. ref'd) (concluding that any error in allowing aunt and legal guardian to testify to complainant's character for truthfulness was harmless and stating that "[a] jury would have expected . . . Alice's aunt and legal guardian who raised Alice as her own child for the six years prior to trial,

29

to testify that Alice was truthful"); *In re G.M.P.*, 909 S.W.2d 198, 206 (Tex. App.—Houston [14th Dist.] 1995, no writ) ("A jury would expect a mother to testify that her son was truthful, and would likely view such testimony with natural skepticism."). Accordingly, any error from the admission of a mother's testimony regarding whether she thought her child was telling the truth is likely to be harmless. *See Fitzgerald*, 2012 WL 683400, at *3 (determining that any error from admission of testimony about whether mother believed her daughter was harmless).

Arguably the analysis from above would be enough to show a lack of harm in this case. However, we note that utilizing the traditional harm considerations also weighs in favor of a finding of no harm. Although Baron-Munoz is correct that no witness other than A.D. and I.D. testified to observing the abuse and that no DNA or surveillance footage demonstrated that abuse had occurred, *see Hammer*, 296 S.W.3d at 561-62 ("Sexual assault cases are frequently 'he said, she said' trials in which the jury must reach a unanimous verdict based solely upon two diametrically different versions of an event, unaided by any physical, scientific, or other corroborative evidence."), the evidence that was introduced in this case supports the jury's verdict, *see Motilla*, 78 S.W.3d at 358 (noting that "evidence of the defendant's guilt is a factor to be considered" in harm analysis under Rule 44.2(b)).

Testimony from the victim of a sexual offense who was seventeen or younger at the time of the offense is sufficient to support a conviction for the offense. *See* Tex. Code Crim. Proc. art. 38.07; *Hiatt v. State*, 319 S.W.3d 115, 121 (Tex. App.—San Antonio 2010, pet. ref'd); *Bargas*, 252 S.W.3d at 888. Moreover, the details from I.D.'s testimony about the abuse, including the types of abuse and how it escalated, were corroborated by A.D.'s testimony concerning the abuse that she suffered by Barron-Munoz. Additionally, the SANE and the outcry witness testified regarding what types of abuse I.D. described and when they happened,

30

and that testimony was consistent with I.D.'s testimony at trial. Similarly, the forensic interviewer discussed grooming and its stages, and I.D.'s testimony regarding how the abuse began and escalated and how Barron-Munoz treated her differently than the other children lined up with the interviewer's description. Likewise, the interviewer's testimony concerning family dynamics that can increase the potential for abuse aligned with the testimony concerning I.D.'s family structure and interactions. *See Tharp v. State*, 714 S.W.3d 118, 141 (Tex. App.—Austin 2024, no pet.) (noting in Rule 44.2(b) analysis that multiple witnesses confirmed portions of victim's testimony and provided examples of other sexual conduct with children by defendant).

Significantly, there was also evidence establishing efforts by Barron-Munoz to avoid his arrest. *See Hedrick v. State*, 473 S.W.3d 824, 830, 831 (Tex. App.—Houston [14th Dist.] 2015, no pet.) (explaining that evidence showing "[a] consciousness of guilt is perhaps one of the strongest kinds of evidence of guilt" and that evidence regarding defendant's conduct after commission of crime can indicate consciousness of guilt). For example, evidence was presented at trial demonstrating that he attempted to avoid detection and arrest by moving his truck across the border, driving a car that was not linked to him, and acquiring and possessing fake identification cards.

Moreover, although Mother testified that she believed her daughters, Barron-Munoz emphasized in his opening argument that Mother's actions indicated that she did not believe A.D. and I.D., and as he pointed out, there was evidence indicating that Mother did not believe her children. Specifically, witnesses testified that Mother attempted to help Barron-Munoz evade arrest and arranged for him to go into I.D.'s bedroom after I.D. made the allegations. Further, as noted by Baron Munoz, the investigator testified after Mother and related that Mother repeatedly told the investigator that the family wanted the charges dropped and that

31

A.D. and I.D. might have been lying, and Mother testified in her cross-examination after making the believability comment that she was not sure what to make of the allegations. *Cf. Clifford v. State*, 653 S.W.3d 1, 13 (Tex. App.—Austin 2022, pet. ref'd) (noting when determining that there was no harm under Rule 44.2(b) that defendant cross-examined witnesses on issue of identity after extraneous-offense evidence was admitted). Moreover, we disagree with Barron-Munoz's suggestion that Mother's desire to have the charges dropped could have stemmed only from a need for his continued financial support rather than from an assessment of credibility, particularly in light of his own testimony that Mother did not need his financial resources. Accordingly, the strength and impact of her believability statement was significantly reduced by other evidence presented at trial. *Cf. Sandoval*, 409 S.W.3d at 295 (noting that opinion was not particularly powerful).

Additionally, Barron-Munoz repeatedly informed the jury panel in voir dire and the jury in his opening and closing arguments that the jury would have to determine the credibility of the witnesses at trial. Similarly, the jury charge instructed the jury that they were the ones who "judge[d] the believability of the witnesses and what weight to give their testimony." *Cf. Moreno v. State*, No. 04-19-00280-CR, 2020 WL 3441439, at *6 (Tex. App.—San Antonio June 24, 2020, pet. ref'd) (mem. op., not designated for publication) (noting that similarly worded jury instruction sufficiently corrected improper comment).

Although the State did briefly mention that Mother "now believes [Barron-Munoz] assaulted her daughters" when discussing her prior efforts to prevent his arrest, the State did not make any other reference to Mother's testimony about her believing her daughters. *See Coble*, 330 S.W.3d at 287 (noting that State's argument did not weigh in favor of harm where State "barely mentioned" witness during closing and did not emphasize his opinions);

32

*Haley v. State*, No. 10-22-00267-CR, 2024 WL 860894, at *4 (Tex. App.—Waco Feb. 29, 2024, no pet.) (mem. op., not designated for publication) (highlighting in harm analysis that "the State only briefly mentioned [extraneous offense] in its closing argument"). Further, the State, like Barron-Munoz, reminded the jury that they were tasked with evaluating the credibility of all the witnesses and deciding which ones were telling the truth. Moreover, the State primarily focused on the evidence supporting each of the charges and highlighted that I.D.'s testimony was corroborated by A.D.'s testimony and consistent with the testimony from the SANE and the outcry witness. *Cf. Clifford*, 653 S.W.3d at 13 (noting that State's closing focused on evidence establishing charged offenses and provided only limited mention of extraneous offenses that should not have been admitted).

Additionally, Barron-Munoz was able to present his defense attacking the credibility of A.D. and I.D. through cross-examination and through his argument by highlighting that neither child reported the alleged abuse or asked for help for years despite there being other people in the home when the abuse occurred and by highlighting that no one else in the home observed anything inappropriate. *See Smith v. State*, Nos. 11-20-00215—00216-CR, 2022 WL 2720466, at *4 (Tex. App.—Eastland July 14, 2022, no pet.) (mem. op., not designated for publication) (noting in harm analysis that ruling did not prevent defendant from presenting his defense).

Considering all of the above, we conclude that any error stemming from the trial court's overruling Barron-Munoz's objection to Mother's believability testimony did not have "a substantial and injurious effect or influence in determining the jury's verdict" and therefore did not affect his substantial rights. *See King v. State*, 953 S.W.2d 266, 271 (Tex. Crim. App.

33

1997).  Accordingly, we conclude that any error would have been harmless.  *See* Tex. R. App. P. 44.2(b).

For these reasons, we overrule Barron-Munoz's third issue on appeal.

## CONCLUSION

Having overruled all of Barron-Munoz's issues on appeal, we affirm the trial court's judgments of conviction.

_____

Karin Crump, Justice

Before Justices Triana, Theofanis, and Crump

Affirmed

Filed:   August 7, 2025

Do Not Publish